In The

## *Court of Appeals*

## *Ninth District of Texas at Beaumont*

_____

### NO. 09-23-00315-CR
_____

### HERSHELL OBEY JR., Appellant

### V.

### THE STATE OF TEXAS, Appellee

**On Appeal from the Criminal District Court**
**Jefferson County, Texas**
**Trial Cause No. F20-36121**

### MEMORANDUM OPINION

A grand jury indicted Appellant Hershell Obey for continuous sexual abuse of a child, a first-degree felony. *See* Tex. Penal Code Ann. § 21.02. The indictment alleged that from November 29, 2010 through on or about November 28, 2014, Obey, when he was 17 years of age or older, and when David[1] was younger than fourteen years of age:

---

[1] We use pseudonyms to refer to the alleged victim and family members. *See* Tex. Const. art. I, § 30(a)(1) (granting crime victims "the right to be treated with

. . . intentionally or knowingly cause[d] the penetration of the mouth of [David], by inserting the Defendant's sexual organ; and

. . . intentionally or knowingly . . . cause[d] the sexual organ of the Defendant to contact the mouth of [David]; and

. . . intentionally or knowingly cause[d] the penetration of the anus of [David], by inserting the Defendant's sexual organ; and

. . . intentionally or knowingly . . . cause[d] the sexual organ of the Defendant to contact the anus of [David.][2]

Obey pleaded "not guilty" to the offense, and a jury found Appellant guilty as charged in the indictment. Appellant elected for the jury to determine punishment. After hearing punishment evidence, the jury assessed punishment at twenty-five years of confinement. The trial court sentenced Appellant in accordance with the jury's verdict. Appellant timely appealed. On appeal, Appellant challenges the legal and factual sufficiency of the evidence supporting his conviction. We affirm the trial court's judgment.

Evidence at Trial

Sherry's Testimony

Sherry testified that David's mother is her first cousin. According to Sherry, David's mother and father lived in Baytown, and when David was young there was

---

fairness and with respect for the victim's dignity and privacy throughout the criminal justice process."). We also use pseudonyms for any non-law enforcement witnesses.

[2] Some of the omissions from the indictment include duplicative language abandoned by the State at trial, and the defense had no objections to deleting the duplicative language.

a time that he had to stop living with his parents. Sherry testified that when David was nine or ten years old, he lived in Port Arthur with Sherry's uncle, Robert, who was also David's grandfather and the father of Sherry's cousin, Daniel. When David moved into Robert's home, Daniel, Robert's son, also lived there, and the house was near where Sherry lived. Sherry testified that she remembered the timeline of when David came to live in Port Arthur because David was a year and a half or two years older than her oldest son and at that time David and her oldest son and other cousins attended the elementary school down the street. According to Sherry, when Daniel moved to an apartment, David moved from his grandfather's and moved in with Daniel, who was David's uncle. Sherry testified that David and Daniel had a close relationship and Daniel helped raise David.

Sherry identified the defendant at trial as Obey and testified that she grew up with him and that he was considered like family as he was best friends with Daniel. According to Sherry, Obey lived with her for a couple of months when she lived in Lake Charles around 2015 or 2016. Sherry testified that Obey has a wife but that both Obey and Daniel are bisexual. Sherry testified that Obey's mother lived in the same area as Robert's house and Sherry's house in Port Arthur. According to Sherry, Obey was considered by her children and the other children as "the favorite uncle[]" and would let the children do whatever they wanted to do when they were with him.

3

Sherry testified that she trusted her children with Obey in the past but now she would not trust him with her children.

Sherry testified that when David briefly lived with Daniel, Daniel lost his job and had to move from his apartment, so David moved back with his mother in Baytown briefly until he went to live with Obey. Sherry testified that she did not know where Obey lived during that time, and that during that time David would not attend family functions which was uncharacteristic of David. According to Sherry, when David was younger, he was quiet but playful and was always around other children, and he was close with Sherry's niece who was David's cousin, Allison.

Robert's Testimony

Robert testified that he is David's grandfather, Robert's daughter is David's mother, and Daniel is one of Robert's sons. According to Robert, when David was younger, he stayed with Daniel at Robert's house in Port Arthur briefly until Daniel found an apartment, and then David and Daniel lived at Daniel's apartment in Port Arthur. Robert testified that David did go back to Houston to stay with his mother for "[a] little time." Robert testified that he had known Obey for a while, Daniel had initially introduced the family to Obey, Obey visited Robert's house occasionally, and Obey was a good friend who was treated like a family member. According to Robert, he knew that Daniel was bisexual but was not aware of whether Daniel and Obey had a romantic relationship.

4

Robert testified that he believed that David was about eleven years old when he first came to stay in Port Arthur around 2012, but David could have been younger or older. Robert testified that David stayed multiple times with Daniel and went back to Houston or Baytown to stay with his mother, and that when David was staying with Daniel in Port Arthur, it was common for Daniel, Obey, and David to be at Robert's house when he was at work. Robert testified that he never had questions or concerns about Obey being around David.

Allison's Testimony

Allison testified that she is David's cousin and that she is three years younger than him. According to Allison, she and David were always close and always together as they grew up. Allison testified that she remembered that when she first moved to Port Arthur and David was staying at Robert's house with Daniel, she was in the first grade. She testified that she remembered when David went back to his mother's house and then Obey brought him back to Port Arthur. Allison testified that she grew up with Obey who was like a family member and that her uncle, Daniel, introduced everyone in the family to Obey as his friend and later Allison's mother married Obey's cousin. Allison testified that it was fun to be around Obey when she was younger, and the children in the family liked to stay with Obey because he would let them do things that their parents would not let them do.

5

Allison testified that she was born on June 4, 2005, and David was born on November 29, 2001. According to Allison, when she was in the seventh grade and twelve or thirteen years old and David was sixteen or seventeen years old, David approached Allison wanting to tell her something about Obey, and David was crying and shaking when he explained to her what Obey had done to him and made her promise not to tell anyone. She testified that she kept her promise and that as she and David got older, they had more talks about what had happened to David. Allison testified that around the time David was in middle school, he was admitted to a mental institution because he was suicidal. Allison testified that she remembered a time when David lived with Obey when David was around fifteen, sixteen, or seventeen, and Obey did not allow David to come to visit his family and Obey explained that it was because David did not clean up the house. According to Allison, David lived with Obey off and on until he was eighteen years old.

Testimony of Detective Tomas Barboza

Detective Tomas Barboza with the Port Arthur Police Department testified that he assists in various cases in performing forensic downloads from electronic devices and that in 2020 he assisted Detectives Guedry and Jaquez in performing a download of specific files from David's phone. According to Detective Barboza, he downloaded from David's phone copies of two files associated with a photograph (JPEGs) and two movie or video files (MOVs). The two photos, the two videos, and

6

the metadata from the two video files were admitted into evidence. According to Barboza, the metadata for the video files indicated that they were created by an iPhone 6S and one of the videos was created on September 30, 2019, and the other video was created on March 2, 2020.

Testimony of FBI Agent Nate Ayers

Special Agent Nate Ayers with the FBI testified that in 2020 he assisted in an investigation concerning Obey being conducted by the Port Arthur Police Department. According to Agent Nayers, he reviewed the initial reports from Port Arthur Police Department and looked at the location where the crimes allegedly took place and conducted surveillance of a residence and began drafting a search warrant for the residence but learned that Obey no longer lived there. Special Agent Ayers testified he continued to monitor the case and, when Obey was arrested on state charges, Ayers inquired into whether Obey had any devices on his person when arrested. According to Ayers, he learned that at the time of Obey's arrest, Obey did not have any devices on him that Ayers could have examined forensically to determine whether or not they contained child pornography.

Daniel's Testimony

Thirty-six-year-old Daniel testified that he is David's uncle, and that David is like a son to him because Daniel took care of him and had been a parent to him in many ways for large periods of David's life. According to Daniel, David first came

7

to live with him at the end of 2006 in Port Arthur when David was about five years old until Daniel moved back to Houston in 2009. Daniel testified that David's mother was having problems, David's father had been released from prison and there were issues of physical violence, and Daniel volunteered to take care of David so he would not be living with his father. After David moved back to Baytown with his mother in 2009, Daniel moved back in September of 2011 to his father's house in Port Arthur, and David came to live with Daniel at that time as well. Daniel testified that around the same time, he met Obey, who was about to turn eighteen years old and lived with his mother a couple of streets over. Daniel testified that he is bisexual and that he and Obey had a romantic relationship for a couple of months when they met which "evolved into more like brothers than anything." According to Daniel, Obey was introduced to Daniel's extended family within the second week of meeting him, and then Obey was around the family on almost an every day basis and was considered part of the family and would often volunteer to help family members by transporting and babysitting their children when they needed it. Daniel described Obey as charismatic and agreed that the children in the family considered Obey the "fun uncle[.]"

Daniel testified that he lived with David at Daniel's father's house for about a year or two when David was nine or ten years old in 2011 and 2012, Obey met David sometime after January of 2012, then Daniel moved into his own apartment

8

with David in mid-2012 until September of 2014 when David was eleven or twelve years old. According to Daniel, he enrolled David in school at Tekoa in August of 2012. Daniel testified he had to move out of the apartment in September of 2014 because his employment situation changed so he could no longer take care of David. According to Daniel, he was under the impression that David was going back to live with his mother, but Daniel found out from Obey a couple months later that David was living with Obey. Daniel testified that at the time David was living with Obey he was around thirteen years old. Daniel testified that although he may not remember well all the dates from that long ago and spanning over a decade, he would trust David's memory on those dates, but Daniel knew that whenever David was living with him that David was under fourteen years of age.

Daniel testified that when he lived at his father's house, Obey babysat David while Daniel was at work and that Obey had time with David by themselves "pretty often[]" and on a day-to-day basis. Daniel testified that at one point Obey lived in an apartment complex within walking distance to Daniel's apartment in Port Arthur but he could not remember when Obey lived in that complex, but Daniel stated that "regardless, he was there with us every day[]" at Daniel's apartment and after Daniel left for work, Obey would help get David up and take him to school. Daniel testified that throughout the entire time he lived at his father's house with David and also

when he and David lived at the apartment, it was a regular occurrence for Obey to come over and be alone with David during those various periods of time.

According to Daniel, he never noticed anything sexually inappropriate between Obey and David, and if he would have noticed that then he and Obey "would have had a problem[]" and "[i]t would have been addressed." Daniel testified that he had not seen Obey in the years leading up to the trial, and if the allegations against Obey were true, Daniel "just wouldn't understand the reasons[]" and felt that if he had never introduced Obey to the family then maybe the assaults would not have happened.

Testimony of Sadie Guedry

Sadie Guedry testified that she was formerly a detective with the Port Arthur Police Department and investigated this case. Guedry testified that a patrol officer contacted her and told her about this case that had just been reported to him. According to Guedry, the officer thought Guedry should look into it and Guedry's supervisor assigned her the case. Guedry testified that she spoke to eighteen-year-old David the next day at the police station. Guedry testified that David was born on November 29, 2001. According to Guedry, David told her that Hershell Obey, who was a close friend of the family, had sexually abused him since he was nine or ten years old. According to Guedry, because David was eighteen years old and was reporting abuse he suffered when he was younger, she was allowed to continue to

10

talk to him because he was an adult. Guedry testified that David pointed her to digital evidence on his cell phone, and she asked Detective Barboza, who was trained in downloading digital files from electronic devices, to assist her in downloading two photos and two videos. Guedry testified that when she asked David why he did not initially report the abuse, he said there were many different factors, including a fear of reporting or a fear of Obey, and that before David was eighteen, he was not an adult and did not have the confidence or financial stability to be out on his own.

According to Guedry, the first location that was pertinent to her investigation was David's grandfather's house in Port Arthur where David moved in with Daniel and his grandfather when David was nine or ten years old, and that Obey would have been at least seventeen years old at that time. Guedry testified that during her investigation, David reported that he later moved to Obey's mother's house where Obey lived, then moved back to Baytown when he was around thirteen years old, then moved back to Daniel's apartment when he was around fifteen years old. David said after that he moved back to his mother's house in Baytown when he was approximately sixteen years old, then moved back in with Obey at an apartment in Port Arthur, then moved with Obey to Obey's mother's house in Port Arthur for a few months. Later he lived with Obey and his wife and children in a rental house in Port Arthur, which was the last permanent place David lived at the time when he made his outcry to Guedry. Guedry testified that although the timeline of the dates

11

and addresses were confusing and that it would not surprise her if David's memory about those may be "off" because he was remembering when he was a child, she confirmed that David lived in Port Arthur from approximately 2010 to 2014 (when he was younger than fourteen) and did not move around much when he was under the age of fourteen. Guedry testified that prior to living with Obey when David was sixteen, David lived in Port Arthur with his grandfather or uncle or some combination of the two, and that Obey was around him during that time.

Guedry testified that she reviewed the screenshots of images admitted as State's Exhibit 3 and two videos admitted as State's Exhibit 4 on David's phone when he initially talked to her about his outcry and his abuse, and those exhibits were published to the jury. According to Guedry, the screenshots of images admitted as State's Exhibit 3 that were sent to David's phone depict a penis, and one of the images depicts a scar or mark on the inner thigh that provided Guedry a potential identifier that helped her identify Obey's identity as the person in the images. Guedry testified that the two videos admitted as Exhibit 4 depict David giving oral sex to a male whose face is not shown, and the videos also depict a similar identifying marker in the same area as in one of the images admitted as Exhibit 3, except in the videos the mark looked like it had healed some. According to Guedry, David informed her that the two photographs were of Obey and that Obey was the male whose face was not shown in the two videos. Guedry testified that the metadata admitted into

evidence for the two videos indicated that the first video was created on September 30, 2019, at Obey's mother's house, and the second video was created on March 2, 2020, at the rented residence where David last lived with Obey. Guedry testified that David would have been seventeen years old in the first video and eighteen years old in the second video.

Guedry obtained a search warrant to take photographs of Obey to help determine if he was the person in the images and the videos, and the photographs she took of Obey two-and-a-half years after David made his allegations and just prior to trial were admitted into evidence and published to the jury. On cross-examination, Guedry acknowledged that she "would have done things differently[]" and attempted to locate Obey earlier to take the photographs, but she was unable to locate him for the search warrant and "he fled to Dallas[.]" According to Guedry, the photographs depict a possible scar in the same general area as the scar or marking in one of the images and in the two videos, and the one of the photographs she took of Obey shows an arm tattoo that was consistent with the person's tattoo in the second video. Guedry testified that based on her findings, the individual depicted in State's Exhibit 3 and in State's Exhibit 4 with David had a scar in the same location as documented in her photographs of Obey.

Guedry recalled that she had information that Obey had other files on his devices that might contain similar pornographic content and she communicated with

FBI Agent Nate Ayers to obtain help in finding Obey and any of his devices, but that when Ayers conducted surveillance, he learned that Obey had left the area. According to Guedry, she viewed a forensic interview by the FBI of David, and the information David gave the FBI was generally consistent with the information he gave her, although the FBI interviewer had the benefit of having information Guedry had obtained during her investigation so the FBI interviewer was able to ask more informative questions that may have led David to reveal more information than he offered in Guedry's interview. Guedry testified that based on her investigation she was able to definitively confirm that David and Obey were the two people in the videos, and that even though David was older than fourteen years old and above the age of consent at the time they were created, Guedry believed that the videos helped explain David and Obey's relationship prior to the creation of the videos, supported the fact that they had a previous sexual relationship, and corroborated other evidence Guedry obtained supporting David's allegations that Obey sexually abused him when he was younger than fourteen years of age. Guedry testified that the fact that David had a continuing sexual relationship with Obey after David turned seventeen or eighteen years old is consistent with David's abuse allegations, because that could be typical behavior of a victim of sexual abuse if the victim feels they have nowhere to go. According to Guedry, she believed David had an emotional connection to Obey and that in situations where an adult is sexually abusing a young child, the

14

adult gains the trust of the child through grooming, and that in those situations the victim can have some sort of attachment to the abuser and even feel love for them even after the victim continues to have a relationship with the abuser once the victim was of the age of consent.

David's Testimony

David testified that at the time of trial he was twenty-one years old, and he was born on November 29, 2001. He testified that when he was younger, his mother lived in the Baytown area and his father was in prison. According to David, when his father got out of prison and returned home, he was physically abusive to David and David moved to stay with his Uncle Daniel at David's grandfather's house in Port Arthur when David was five, six, or seven years old. David testified that he moved back home to Baytown and then moved again when he was nine, ten, or eleven years old to live with his Uncle Daniel at David's grandfather's house in Port Arthur. David agreed on cross-examination, however, that according to school records, he came back to Port Arthur in 2012. David testified he attended Tekoa Academy "which is on the elementary side." David recalled that when he went to middle school in Port Arthur, he was living with his Uncle Daniel at Daniel's apartment in Port Arthur. David testified he moved back to Baytown when he was thirteen years old for his seventh and eighth grade years at Baytown Junior High, came back to Port Arthur and lived with Obey, went back to Baytown, returned to

Port Arthur when he was fifteen or sixteen years old and lived with Obey and Kathy. Later, David moved back to Baytown briefly when he was sixteen, and then he moved back to Port Arthur when he was a junior and was supposed to live with his aunt but ended up living with Obey and Kathy because his aunt had already taken in David's sister and three children and David did not believe his aunt could financially take him in, too.

David recalled moving back and forth often and felt like he either did not have a choice where he lived or that if he did have a choice, he had to choose the "best of two bad choices." Although David agreed he had difficulty in reconstructing the timeline of when he lived in Port Arthur, he remembered that when he was younger than fourteen, he spent the majority of that time in Port Arthur and some brief periods of the time in Baytown. According to David, when he was younger, he wanted to live with his Uncle Daniel because he felt safe with him in the beginning and if he lived with his mother he had to "worry[] about getting beat on or things like that."

David recalled that when his Uncle Daniel introduced him to Obey, Obey took David and David's aunts and his cousins to a store to buy food. David testified that when he met Obey, Obey was at least eighteen years old and was out of school. David testified that he and his cousins liked being around Obey because he was fun to be around, would get them out of the house to have fun, and they got to do whatever they wanted. According to David, Obey took a special interest in spending

time with David, Obey would baby-sit him, and Obey would take and pick him up from school, buy him clothes and toys, and was like a father-figure. David recalled he felt like Obey cared about him. David testified that he would be at Obey's house when he got out of school until his Uncle Daniel got off work, and David spent a lot of time with Obey. David saw Obey at least once a week when he first moved to Port Arthur when he was roughly nine, ten, or eleven years old and all the way up until he moved back to Baytown the last time. David testified that even when he lived at his Uncle Daniel's apartment when David was in middle school, Obey would often come over because at some point he moved to the apartment complex directly behind Daniel's complex and he would often drop David off or pick him up from school. David testified that it felt natural to move in with Obey later. David recalled that when he was younger, he had heard that his Uncle Daniel and Obey had been in a romantic relationship, but he did not know for sure. According to David, he did not really think about his own sexuality before he was around his Uncle Daniel and Obey, but they influenced him because he was close to them, and as a result, he concluded that he is gay.

According to David, Obey first sexually abused him when he was nine or ten or eleven years old, about two or three years after they first met. David recalled that it was at the end of elementary school, and he and Obey were the only people home and he was taking a bath at his grandfather's house which only had one bathroom.

David recalled that he unlocked the bathroom door because Obey said he needed to use the bathroom, and David got back in the bathtub. According to David, Obey used the restroom, left, came back in and poured a jug of cold water on David as a prank, they laughed, Obey left, Obey came back in, locked the bathroom door behind him, took off his clothes, told David to open his mouth, and Obey forcefully made David give him oral sex by putting his penis in David's mouth. David recalled that Obey cleaned himself, put on his clothes, left the bathroom, and told David not to tell anyone and it was their secret. David testified in detail what occurred, and he recalled that he was a child and that he did not know if it was wrong, but that he was scared and was afraid of Obey after that. David testified that he did not tell his grandfather about what had happened because he was afraid his grandfather would not believe him, and David did not want Obey to get hurt because Obey treated him like his own son, and David had never had a father-figure like that. David recalled that after that he still wanted to be around Obey but did not want him to do that again. David testified that Obey then started to buy him more toys and clothes, would take him more places, and would check him out of school early.

David testified that the sexual assaults started again a few months later and that they occurred at Obey's mother's house when Obey took him there while Obey's mother was in the hospital. David described when Obey sexually assaulted him at Obey's mother's house "[s]ometime down the line[]" and how Obey forced David

18

to give Obey oral sex on the couch and in the master bedroom. According to David, this happened often. David testified that in the beginning Obey had to force him but then "down the line" David knew what to do and "[went] along with it."

David testified that he said "no" to Obey's sexual advances a few times, including a time at Obey's mother's house that Obey got on top of David and pinned David's arms down with Obey's knees and forced David to perform oral sex on him despite David telling him, "no." David recalled in detail another instance when Obey sexually abused him when he was living at his grandfather's and David was between the age of nine and twelve and attending Tekoa elementary school, and he recalled another time when he and Obey were at Obey's mother's house when she was not there and Obey penetrated David's anus with his penis, David told Obey it was hurting, and then Obey made David perform oral sex on him. David described another instance where he tried to tell Obey "no" at Obey's mother's house when he was about sixteen or seventeen and living with Obey, and Obey came into the guest bedroom late at night when Obey's wife Kathy was in the other room, and Obey stood over David and made him perform oral sex despite David telling him, "no." According to David, Kathy interrupted them by knocking on the locked door and Obey told Kathy his reason for being in there was that he was lying on the heating pad and his back was hurt. David felt like Kathy was "turn[ing] a blind eye[]" to what was going on and David knew that Kathy knew Obey was bisexual, including

19

that she would make jokes at home about it. According to David, the assault at his grandfather's in the bathtub and the time Obey forced him into anal sex were more than a year apart, but in between those times Obey forced David to perform oral sex once or twice a week, and it could have been fifty or a hundred or more times. He also testified that when he was younger than fourteen years old, Obey sexually assaulted him at Susan's apartment playing hide and seek, David was hiding in a bed, and Obey made him perform oral sex on him while Obey touched David's genitals.

According to David, he and Obey began recording some of the sexual acts Obey was having David do or perform on him, including the videos from David's phone and screenshots from videos that had been admitted into evidence as State's Exhibits 3 and 4. David testified that the videos were recorded on David's phone when he was seventeen and eighteen. David identified himself and Obey in the videos, identified Obey's tattoo in one of the photographs, and testified that Obey had a scar or scratch on his inner left thigh. David testified that he and Obey used Snapchat for purposes of exchanging the videos containing sexually explicit content between Obey and David because they could set Snapchat to delete the video right after it was opened.

David testified that he got along well with Kathy, and Kathy's financial stability was one of the reasons he wanted to stay with them. When he chose the last

20

time to return with Kathy and Obey to live with them, he knew the abuse could continue but he knew he would be better cared for with Kathy and Obey. David testified that he did not say anything about the abuse until he was eighteen years old, and that "[i]t wasn't even supposed to come out then."

Dustin's Testimony

Dustin testified for the defense and testified that he and David had been friends since they were around eleven years old and that, although they had not talked in "quite a while[,]" their friendship had continued until the time of trial. At some point, David told Dustin that Obey was in jail, Dustin was shocked and asked why, and David told him about his allegations against Obey. Dustin testified that because he knew Obey and was surprised at the allegations, he on a later occasion questioned David about whether the allegations were true, and David stated that they were not true and that he was lying and was angry. According to Dustin, David never said what was causing his anger.

Barbara's Testimony

Barbara, Obey's mother and a witness for the defense, was familiar with David because David had lived with Obey. She testified that she met David in 2012 and that, at that time, Obey was living with Susan. Barbara testified that she had no contact with David from 2012 until 2017. According to Barbara, in the times that Obey lived with her, David never lived there with him, but in 2017, Kathy, Obey,

21

their children, and David moved into Barbara's home after Hurricane Harvey and Barbara did not want David living there. Barbara testified that she called David's mother and told her to come pick David up because he was not going to stay at Barbara's house because Barbara did not want him living there because she had seen him disrespect his aunt, and David's mother came and picked him up. According to Barbara, in 2018 David came back and lived with Obey and Kathy and their children in her house and she tried to evict David, but the police informed her she could not because Obey and Kathy were David's guardians.

Barbara agreed that she talked to Obey over the phone the night before, after her testimony at trial had started and the trial recessed for the day, and they talked about how her testimony went, how she got confused when she testified, and about the locations she testified to. She denied talking to Obey about the case any time prior to the telephone call the night before, and she denied knowing that Obey was bisexual or that he had a sexual relationship with David.

Esther's Testimony

Esther, Obey's mother's friend testified as a witness for the defense. Esther explained that she lives across the street from Barbara, Obey's mother, and she has a key to Barbara's house. According to Esther, she has been friends with Barbara for a long time, she and Barbara "treat each other like sisters[,]" and she has known Obey since he was born. Esther agreed that Obey lived with Barbara until June of

2011 and that he would have to get a key from Esther in order to get into his mother's home, he was not allowed to have anyone go in the home with him, and the only way he would go in the house is when Barbara would tell Esther to let him in.

Esther testified that she knew of David through her grandson saying who David was in passing and she did not see David in 2010, 2011, and 2012. Esther could not recall when she first met David, but believed he was maybe ten or eleven years old.

Linda's Testimony

Linda, Obey's mother-in-law and a witness for the defense, testified that she met David through Obey in 2017, when David came to stay with her in Nederland during Spring Break or some other break for a short amount of time. Linda recalled that David used her Nederland address "to go to school[,]" he would be at her house until someone picked him up after school, but he did not spend the night there other than over that one break. According to Linda, after that, David moved in with Obey and Kathy and their children at Barbara's house. Linda testified that she lived with Obey and Kathy at their apartment in 2019 with David and his brother. Linda recalled that in 2019, she and Obey picked David up in Baytown after David had called Obey several times stating that David's mother had kicked him out, he had nowhere to go, and they brought him back to Obey and Kathy's apartment to stay. According to Linda, she never noticed anything inappropriate between Obey and

23

David, and based on her experience with David and his reputation, she did not believe David was trustworthy. Linda agreed she had been told about the video with Obey and David, and she stated that Obey would have been twenty-seven years old when David was seventeen. Linda testified that she trusted Obey around her grandchildren.

Kathy's Testimony

Kathy, Obey's wife and a defense witness, testified that she was asked to help prepare a timeline in preparation for the trial and that she provided a description of where she and Obey were living at the time and had pictures to support the statements. According to Kathy, she met Obey in 2009, they started living together in 2016 at Obey's mother's house where he had been living, and after a month or two, Obey and his mother had an argument, and Obey and Kathy moved in with Kathy's mother. Kathy recalled that in November of 2016 she and Obey separated because Obey was living with another woman, and then Kathy and Obey got back together in January of 2017, when she was pregnant with their son. Kathy testified that she first met David when he was sixteen and he and his siblings came and stayed with them for Spring Break when she was pregnant, she had only met David's mother once, she was not aware at that point that David had previously lived with Obey, and she did not want David and his siblings living with them. They took them back to Baytown and David's mother gave David a choice where to live and he

24

wanted to live with Kathy and Obey so they brought him back home with them that same day. According to Kathy, she and Obey have been David's "legal guardians" since March of 2017, but they did not go through court and instead had powers of attorney. Kathy testified that David lived at her mother's home in Nederland from March of 2017 so he could go to school in Nederland because Kathy did not want him in school in Port Arthur, David went back and stayed a little while with his mother because he did not want to go with Kathy and Obey to Louisiana, and eventually David moved in with Obey and Kathy in Port Arthur. Kathy testified that after Hurricane Harvey messed up their apartment, they stayed at a hotel in Louisiana from September 2017 until January of 2018, but David went back to Baytown, and then they moved back to Obey's mother's house. Kathy testified that she married Obey in 2018. According to Kathy, she did not see David again until 2019 when they got a phone call that David's mother had kicked him out and he was coming to live with them. Obey's mother told Kathy and Obey that she was not comfortable with David there, and if he did not leave, they all had to leave. They moved to their own place in 2019, and David moved out in 2020 after there was a fight because Kathy was upset with David for not paying his bills on time and because she constantly had to clean up after him. According to Kathy, Obey and David also had a confrontation and David took his things and left. Kathy agreed that she and Obey decided they wanted to move to get a fresh start away from Port Arthur, and they

25

visited Dallas on June 26, 2020. She testified that she did not know when David reported the case to the Port Arthur Police Department and did not know whether Obey knew, but that if David reported to the police on June 3, 2020, then she agreed that she and Obey were in the process of moving to Dallas a few weeks later. Kathy recalled that in July of 2020 Obey moved to Dallas to live with his cousin and look for employment, but he did not "flee" to Dallas as others alleged.

Kathy testified that Obey's birthday is January 22, 1993, and that around the time of "2010'ish" he would have been seventeen years old. Kathy testified that she never caught Obey and David in an awkward position and never saw anything inappropriate between Obey and David. Kathy testified that she and David developed a bond over time and that he was a troubled child. Kathy agreed that in March of 2020, David was making plans to move out of the apartment without them knowing. Kathy described David as sweet but manipulative, that he had a bad reputation as far as honesty and trustworthiness, and he made allegations to Kathy that Obey was involved in sexual activity. Kathy admitted that Obey had "strayed from the marriage relationship[]" which had caused issues between them, she knew Obey to be bisexual, and agreed that it "would cause problems for [her]" if it was true that during the time that David was above the age of consent he had a consensual relationship with Obey. Kathy agreed that she did not know if Obey and David had a relationship prior to David being seventeen years old. Kathy testified that she

26

talked to Obey on the phone during the trial about the trial and about the witnesses that had come forward. Kathy testified that she loves Obey and did not want anything bad to happen to him.

Kerry's Testimony

Kerry, Obey's cousin and a witness for the defense, testified that she used to date one of Obey's friends. She testified that she would interact with David when she would go to Obey and Kathy's house in 2017. According to Kerry, David would get upset if he was not allowed to go places with Obey, that David had a reputation for being dishonest and for provoking, and that David lied and made allegations that Obey was having an affair with her and others. Kerry testified that she trusts Obey with her children.

Pamela's Testimony

Obey's cousin and a defense witness, Pamela, testified that she had never heard of David, and that Obey had come to stay with her for a few months in the summer of 2010.

Susan's Testimony

The mother of Obey's children and a witness for the defense, Susan, testified that she and Obey were together from 2011 to early 2014, and that David started coming around in maybe 2012. Susan testified that while she and Obey were together, there were times when they broke up and lived at different locations.

27

According to Susan, they began living together in mid-May of 2011 at her mother's house, then they lived for a month or so at his mother's house, and then they moved to an apartment for a couple of years, and then moved to another apartment. Susan recalled that David never lived with them, but she would babysit him on occasion for about thirty minutes or an hour after he got home from school and until his uncle would pick him up. She testified that she stopped babysitting David after he stole her wedding bands and she refused to let him come back. According to Susan, David contacted her once about his allegations against Obey and David was "extremely elaborative[,]" she did not believe him, and at the time of trial, she still did not believe David's allegations.

Sufficiency of the Evidence

On appeal, Appellant challenges the legal and factual sufficiency of the evidence supporting his conviction. We construe Appellant's issue on appeal as a challenge to the legal sufficiency of the evidence. *See Brooks v. State*, 323 S.W.3d 893, 912 (Tex. Crim. App. 2010) (there is no longer any meaningful distinction between a legal and factual sufficiency standard when reviewing sufficiency of evidence to sustain a criminal conviction).

Under the prior version of section 21.02 of the Texas Penal Code applicable here,

(b) A person commits an offense [of continuous sexual abuse of a child] if:

28

(1) during a period that is 30 or more days in duration, the person commits two or more acts of sexual abuse, regardless of whether the acts of sexual abuse are committed against one or more victims; and (2) at the time of the commission of each of the acts of sexual abuse, the actor is 17 years of age or older and the victim is a child younger than 14 years of age.

Act of May 17, 2007, 80th Leg., R.S., ch. 593, § 1.17, 2007 Tex. Gen. Laws 1127, 1127 (amended 2011, 2017, and 2021) (current version at Tex. Penal Code § 21.02).

Section 21.02(c) of the Texas Penal Code defines "act of sexual abuse" as including, among other things, an act that constitutes the offense of aggravated sexual assault. *Id.*

(a) A person commits an offense [of aggravated sexual assault]:
   (1) if the person:
    . . .
    (B) intentionally or knowingly:
     (i) causes the penetration of the anus or sexual organ of a child by any means;
     (ii) causes the penetration of the mouth of a child by the sexual organ of the actor;
     (iii) causes the sexual organ of a child to contact or penetrate the mouth, anus, or sexual organ of another person, including the actor;
     . . . or
     (v) causes the mouth of a child to contact the anus or sexual organ of another person, including the actor; and
   (2) if:
    . . .
    (B) the victim is younger than 14 years of age[.]

*See* Act of Apr. 7, 2011, 82nd Leg., R.S., ch. 1, § 6.05, 2011 Tex. Gen. Laws 1, 16 (amended 2015 and 2017) (current version at Tex. Penal Code Ann. § 22.021). "The State need not prove the exact dates of the abuse, only that 'there were two or more

acts of sexual abuse that occurred during a period that was thirty or more days in duration.'" *Hernandez v. State*, No. 09-23-00007-CR, 2023 Tex. App. LEXIS 9471, at *25 (Tex. App.—Beaumont Dec. 20, 2023, pet. ref'd) (mem. op., not designated for publication) (quoting *Brown v. State*, 381 S.W.3d 565, 574 (Tex. App.—Eastland 2012, no pet.)); *Lane v. State*, 357 S.W.3d 770, 773-74 (Tex. App.—Houston [14th Dist.] 2011, pet. ref'd). "[M]embers of the jury are not required to agree unanimously on which specific acts of sexual abuse were committed by the defendant or the exact date when those acts were committed." Act of May 17, 2007, 80th Leg., R.S., ch. 593, § 1.17, 2007 Tex. Gen. Laws 1127, 1127.

In reviewing the legal sufficiency of the evidence, we review all the evidence in the light most favorable to the verdict to determine whether any rational factfinder could have found the essential elements of the offense beyond a reasonable doubt. *Jackson v. Virginia*, 443 U.S. 307, 319 (1979); *Hooper v. State*, 214 S.W.3d 9, 13 (Tex. Crim. App. 2007). We give deference to the factfinder's responsibility to fairly resolve conflicts in the testimony, to weigh the evidence, and to draw reasonable inferences from basic facts to ultimate facts. *Hooper*, 214 S.W.3d at 13. If the record contains conflicting inferences, we must presume that the factfinder resolved such facts in favor of the verdict and defer to that resolution. *Brooks*, 323 S.W.3d at 899 n.13; *Clayton v. State*, 235 S.W.3d 772, 778 (Tex. Crim. App. 2007). The jury as factfinder is the sole judge of the weight of the evidence and credibility of the

30

witnesses, and it may believe all, some, or none of the testimony presented by the parties. *See Metcalf v. State*, 597 S.W.3d 847, 855 (Tex. Crim. App. 2020) (citing *Esquivel v. State*, 506 S.W.2d 613, 615 (Tex. Crim. App. 1974)).

"Direct and circumstantial evidence are treated equally: 'Circumstantial evidence is as probative as direct evidence in establishing the guilt of an actor, and circumstantial evidence alone can be sufficient to establish guilt.'" *Clayton*, 235 S.W.3d at 778 (quoting *Hooper*, 214 S.W.3d at 13). Each fact need not point directly and independently to the guilt of the defendant, as long as the cumulative force of all the incriminating circumstances is sufficient to support the conviction. *Temple v. State*, 390 S.W.3d 341, 359-60 (Tex. Crim. App. 2013) (citing *Hooper*, 214 S.W.3d at 13; *Johnson v. State*, 871 S.W.2d 183, 186 (Tex. Crim. App. 1993)). The testimony of a child victim, standing alone and without corroboration, is sufficient to support a conviction for sexual assault of a child. *See* Tex. Code Crim. Proc. Ann. art. 38.07(a), (b)(1); *Garcia v. State*, 563 S.W.2d 925, 928 (Tex. Crim. App. 1978).

On appeal, Appellant challenges generally the sufficiency of the evidence supporting his conviction and specifically argues that there was insufficient evidence to support the jury's finding that the State proved beyond a reasonable doubt that David was younger than fourteen years of age when the offenses occurred. The jury heard David testify that he was born on November 29, 2001, and that he moved in with Daniel to David's grandfather's house in Port Arthur when he was between

nine and eleven years old. David testified that he attended Tekoa elementary school and that he would not disagree if school records showed he came back to Port Arthur in 2012. The jury heard David testify that he met Obey when Obey was at least eighteen years old, and the jury heard Kathy's testimony that Obey was born on January 22, 1993. There was evidence presented to the jury from David's testimony that Obey first sexually assaulted him when he was between nine and eleven years old and that it was at "[t]he end of elementary school[,]" and that Obey made David engage in oral sex by forcing David to put Obey's penis in David's mouth while David was in the bathtub at his grandfather's house. The jury heard David testify that the sexual assaults continued a few months later at Obey's mother's house and that those assaults happened often and at least once a week after the time of the first assault. The jury heard David testify that when David was between the age of nine and twelve, and while he was at Obey's mother's house, Obey penetrated David's anus with Obey's sexual organ and Obey put his sexual organ in David's mouth. David also testified that Obey put his sexual organ in David's mouth when playing hide and seek at Susan's apartment when David was younger than fourteen years old. The jury also heard Guedry's testimony that based on her findings, that Obey's scar she photographed matched the scar of the person in the images and videos from David's phone and that even though the videos were created at a time when David was old enough to consent, they corroborated other evidence Guedry obtained

32

supporting David's allegations that Obey sexually abused him when he was younger than fourteen years of age. The jury heard Guedry's testimony that David reported to her that Obey had sexually assaulted him since he was nine or ten years old, and that Obey would have been at least seventeen years old at the time. Guedry testified that it would not surprise her if David's memory of the dates could be "off" because he was remembering when he was a child, but that she confirmed that David lived in Port Arthur from approximately 2010 to 2014 when he was younger than fourteen. The jury heard Daniel's testimony that he moved to his father's house in Port Arthur in 2011 and David came to live with him there in 2011 and 2012 when David was nine or ten years old, that Daniel met Obey about the same time, and that Daniel introduced his family to Obey within the second week of meeting him and from then on Obey was around the family almost every day. Daniel testified that he may not remember the dates well but would trust David's memory on those dates, but that Daniel knew that whenever David was staying with Daniel that David was under fourteen years of age. Daniel also testified David met Obey sometime after January 2012 and that Daniel enrolled David at Tekoa elementary in August of 2012. The jury heard Sherry testify that when David was nine or ten years old, he lived in Port Arthur with David's grandfather and David's uncle Daniel, and that David was a year and a half or two years older than her oldest son and David and her oldest son and other cousins attended the elementary school down the street. The jury heard

33

David's grandfather testify that he believed David was about eleven years old when he first came to stay in Port Arthur around 2012. Also, Allison testified that she is three years younger than David and that she remembered that she was in the first grade when David first moved to Port Arthur and was staying at his grandfather's house with Daniel.

The jury, in its role as factfinder, heard David's testimony and could have found his testimony credible. The jury heard David testify in detail about Obey sexually assaulting David when he was under the age of fourteen years old and that for more than a year the sexual assaults occurred at least once a week. As noted above, the testimony of a child victim, standing alone and without corroboration, is sufficient to support a conviction for sexual assault of a child. *See* Tex. Code Crim. Proc. Ann. art. 38.07(a), (b)(1); *Garcia*, 563 S.W.2d at 928. Based on the evidence at trial, the jury could have concluded that "there were two or more acts of sexual abuse that occurred during a period that was thirty or more days in duration." *See Hernandez*, 2023 Tex. App. LEXIS 9471, at *25; *Brown*, 381 S.W.3d at 574; *Lane*, 357 S.W.3d at 773-74; *see also* Act of May 17, 2007, 80th Leg., R.S., ch. 593, § 1.17, 2007 Tex. Gen. Laws 1127, 1127; Act of Apr. 7, 2011, 82nd Leg., R.S., ch. 1, § 6.05, 2011 Tex. Gen. Laws 1, 16. Even with the conflicting evidence as to David's age, on this record the jury could have inferred from the evidence that, at the time of the acts of sexual abuse by Obey, David was younger than fourteen years of age. *See*

34

*Hooper*, 214 S.W.3d at 14-15 (jurors may draw reasonable inferences from the evidence); *see also* Act of May 17, 2007, 80th Leg., R.S., ch. 593, § 1.17, 2007 Tex. Gen. Laws 1127, 1127; Act of Apr. 7, 2011, 82nd Leg., R.S., ch. 1, § 6.05, 2011 Tex. Gen. Laws 1, 16. We conclude the evidence is sufficient to support the jury's finding that David was under fourteen years of age when he was sexually assaulted by Appellant and Appellant was seventeen years of age or older at the time of the sexual assaults.

Viewing the evidence in the light most favorable to the verdict and deferring to the jury's authority to determine the credibility of witnesses and the weight to give their testimony, we also conclude that a reasonable factfinder could have found the essential elements of the offense beyond a reasonable doubt. *See* Tex. Code Crim. Proc. Ann. art. 38.07(a), (b)(1); *Metcalf*, 597 S.W.3d at 855; *Brooks*, 323 S.W.3d at 902 n.19; *Clayton*, 235 S.W.3d at 778; *Hooper*, 214 S.W.3d at 13; *Garcia*, 563 S.W.2d at 928.

We overrule Appellant's issue and affirm the trial court's judgment.

AFFIRMED.

LEANNE JOHNSON
Justice

Submitted on July 22, 2024
Opinion Delivered July 31, 2024
Do Not Publish

Before Johnson, Wright and Chambers, JJ.

35